# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CODAN FORSIKRING A/S a/s/o, Tomex Foods, ApS; and TOMEX FOODS, APS, | ) ) ) | |
| Plaintiffs, | ) ) | No. 17 C 06921 |
| v. | ) ) ) | Judge Edmond E. Chang |
| CONGLOBAL INDUSTRIES, INC.; CITY HAUL, INC.; and SUMMIT COLD STORAGE CORPORATION, | ) ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This case arises out of the unfortunate spoilage of over 53,000 pounds of frozen pork. The pork thawed in transit when its refrigeration temperature was improperly set to a spring-like temperature of +18° C (64° F) instead of -18° C (0° F). R. 39, Am. Compl.[1] In its journey from Illinois to the Dominican Republic, the pork changed hands several times among different motor and rail carriers. *Id.* ¶ 22. The seller, Tomex Foods, and its insurer, Codan Forsikring, brought suit against ConGlobal Industries, City Haul Inc., and Summit Cold Storage Corp., alleging various violations of the Carmack Amendment, as well as alternative breach of contract and negligence claims, in an effort to recover nearly $70,000 in damages.

---

[1]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

*See generally* Am. Compl.[2] ConGlobal moves to dismiss all claims, arguing that it is not a proper defendant for Carmack liability, that the Carmack Amendment preempts the state law actions, and even if it does not, that the Plaintiffs fail to state a claim. R. 45, Def. Br. at 1-3. For the reasons described in the Opinion, the motion to dismiss is denied.

## I. Background

For the purposes of this motion, the Court accepts as true the allegations in the Amended Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Tomex, a Danish food corporation, hired Summit Cold Storage to store its frozen pork as Tomex looked for a buyer. Am. Compl. ¶ 20. In March 2016, Tomex sold the product to a supermarket chain in the Dominican Republic, so Tomex had to arrange for overseas transportation. *Id.* ¶¶ 21-22. It hired City Haul to carry the cargo by truck from Summit's cold storage facility to the Landers Rail Terminal in Chicago. *Id.* ¶¶ 22. From there, non-party Mitsui O.S.K. Lines would take it by train to Virginia and then by ship to the Dominican Republic. *Id.* It was Mitsui that allegedly contracted with ConGlobal to provide a refrigerated shipping container for the product. *Id.* ¶ 24. Tomex instructed each of its vendors—Summit, City Haul, and Mitsui—that the cargo's temperature had to be maintained at -18° C (0° F), so that it would not thaw and spoil. *Id.* ¶ 23. Mitsui allegedly passed this instruction on to ConGlobal. *Id.* ¶ 25.

---

[2]This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331 and 49 U.S.C. § 14706(d). The Court has jurisdiction over the accompanying state law claims premised on the same allegations under 28 U.S.C. § 1367.

2

At the end of March, the cargo began its journey when City Haul picked up the empty refrigerated container from ConGlobal, which had allegedly set the container's thermostat to +18° C (instead of -18° C), and brought it to Summit's cold storage facility to be loaded. Am. Compl. ¶¶ 26-27. Summit employees packed the frozen pork into the container—without adjusting it to the required -18° C. *Id.* at ¶ 29. At that point, the container's thermostat was still set to +18° C, presumably the temperature since the container's pick-up and where it remained the entire time that the container held the product. *See id.* ¶ 29. Once loaded, City Haul picked up the cargo, issued or accepted a bill of lading to cover the shipment, and agreed to carry it to Landers Rail Terminal. *Id.* ¶ 30. City Haul never adjusted the temperature, even though it too had been instructed to keep the cargo at -18° C. *Id.* ¶ 31. For reasons unexplained in the complaint, City Haul brought the container to ConGlobal rather than to the Landers Rail Terminal (as it was contracted to do). *Id.* ¶ 32. At that point, ConGlobal apparently too did not adjust the temperature from its setting of +18° C. *See id.* ¶ 26. Then, it was allegedly ConGlobal that "transferred it to Landers Rail Terminal," where the container was ramped onto the rail carrier for its trip to Virginia. *Id.* ¶ 32.

When the container arrived in Virginia in early April 2016, Mitsui discovered that the pork had thawed during its travel. Am. Compl. ¶ 33. The thermostat on the container was still set to +18° C. *Id.* The thawed meat was (not surprisingly) a total loss, and Tomex suffered losses totaling $69,356.55. *Id.* ¶ 34. Tomex submitted a

3

claim to its insurer, Codan, which paid the claim minus a deductible, and Codan became subrogated to the rights of Tomex to sue for damages. *Id.* ¶ 35.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).[3] The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

---

[3]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

4

### III. Analysis

### A. Carmack Amendment

In its primary cause of action, Codan[4] claims that both City Haul and ConGlobal breached their contracts of motor carriage. Am. Compl. ¶ 38. The Carmack Amendment to the Interstate Commerce Act governs hired interstate transporters, including motor carriers. *See* 49 U.S.C. § 14706 *et seq*. The main provision of the Carmack Amendment codifies the "common law liability of carriers" for damage to a shipper's goods. *Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 633 (7th Cir. 2001); *see* 49 U.S.C. § 14706. Put simply, the Amendment "provides shippers with the statutory right to recover for actual losses or injuries to their property caused by carriers involved in the shipment." *Gordon v. United Van Lines, Inc.*, 130 F.3d 282, 286 (7th Cir. 1997). This strict liability attaches to a "carrier" that is "providing transportation or service" to a shipper. 49 U.S.C. § 14706(a)(1).[5]

To state a claim under Carmack, Codan must sufficiently allege that ConGlobal is a "carrier," and that as a carrier, it provided "transportation or service[s]" to a shipper. 49 U.S.C. § 14706(a)(1). A carrier includes a "motor carrier," 49 U.S.C. § 13102(3), and the statute defines a motor carrier as someone who provides "motor vehicle transportation for compensation." 49 U.S.C. § 13102(14). While that might seem simple enough, the statutory definition of "transportation" is

---

[4]For ease, the Opinion will refer to the Plaintiffs collectively as Codan, because it is the insurer, unless reference to Tomex specifically is necessary.

[5]There are actually three types of federally licensed entities at play in the interstate motor carrier transport structure: motor carriers, freight forwarders, and property brokers. *See* 49 U.S.C. § 14706, *et seq*. But no party contends that ConGlobal was acting as a freight forwarder or broker in any capacity, so the discussion in this Opinion will focus only on ConGlobal's role as a potential motor carrier.

more detailed and goes beyond just movement—it even covers buildings and places, as well as services. Transportation includes "a motor vehicle, vessel, warehouse, … yard, property, facility, instrumentality, or equipment of any kind related to the movement" of property "regardless of ownership or an agreement concerning use." 49 U.S.C. § 13102(23)(A); *see, e.g.*, *Mitsui Sumitomo Ins. Grp. v. Navistar, Inc.*, 2014 WL 1245290, at *2 (N.D. Ill. Mar. 26, 2014). And transportation also includes "services related" to that movement of property, including such things as "arranging for … refrigeration, … storage, handling, packing, … and interchange" of property. 49 U.S.C. § 13102(23)(B).

The parties disagree over whether ConGlobal qualifies as a "carrier." Codan's broadest argument is that it matters not whether ConGlobal was hired as a carrier for *this* case; it is enough that ConGlobal *generally* holds itself out as a carrier-for-hire. R. 52, Pl. Resp. at 7-8. Codan hangs its hat on *PNH Corp. v. Hullquist Corp.,* 843 F.2d 586, 591 (1st Cir. 1988), but that opinion does not actually help Codan. In *PNH Corporation,* a cargo shipment of coffee was stolen at some point in its journey from Massachusetts to Saudi Arabia. *Id.* at 587. As it changed hands among shippers, the coffee was loaded by Garvey Transport into an empty container supplied by Hullquist Corporation, and Garvey drove the container back to Hullquist's facility. *Id.* Ordinarily, Hullquist did not store containers overnight, but the shipper that was supposed to pick up the container could not do so until the next morning. *Id.* at 588. Hullquist allowed the container to remain at its facility overnight. *Id.* The late-arriving shipper then picked up the container the next

6

morning. *Id*. At the final destination, however, it was discovered that the coffee had been stolen. *Id*.

In response to that set of facts, the First Circuit made this statement: "if Hullquist is otherwise a motor carrier, its storage facilities are 'transportation' within the meaning of the Act." *Id*. at 591. Hullquist argued that it had not acted as a carrier for the coffee, just a place for overnight storage. The First Circuit acknowledged that "Hullquist seems to have acted in the capacity of a warehouseman, rather than a carrier." *Id*. But ultimately the opinion in *PNH Corporation* side-stepped the issue, because the First Circuit was vacating the decision below and remanding anyway, leaving it to the district court to decide whether to consider the issue. *Id*.

So Codan's reliance on *PNH Corporation* amounts to a reliance on dictum. Worse, Codan's broad reading of the Carmack Amendment is not supported by statutory text. Codan suggests that, simply because ConGlobal is a *registered* carrier, Am. Compl. ¶ 8, ConGlobal's role in providing the refrigerated container qualifies—by itself—as "transportation" under the Act *regardless* of whether ConGlobal played any other role in relation to the movement of the pork. Pl. Resp. at 6. But there is simply no statutory text to support that interpretation. Even though a company might act as a carrier "in the ordinary course of its business," to be liable under the Carmack Amendment requires that it did so "in the transaction at issue." *See Independent Machinery, Inc. v. Kuehne & Nagel, Inc.,* 867 F. Supp.

752, 759 (N.D. Ill. 1994); *cf. IBM v. Fernstrom*, 1985 WL 1111, at *5 (N.D. Ill. May 6, 1985). So the broadest argument advanced by Codan is rejected.

Having said that, the amended complaint does allege that ConGlobal *did* transport the container in a way that qualifies under the statute: specifically, after City Haul carried the packed container back to ConGlobal's facility, ConGlobal "transferred it to Landers Rail Terminal." Am. Compl. ¶ 32. As currently crafted, the amended complaint says that City Haul left it up to ConGlobal to move the refrigerated container to the Landers Rail Terminal. Moving the pork to the rail terminal would qualify as moving property under the Carmack Amendment. It matters not that ConGlobal is alleged to have only carried the cargo for a limited distance, and only intrastate. *See Fireman's Fund Ins. Co. v. Reckart Logistics, Inc.*, 2011 WL 4062508, at *3 n.1 (N.D. Ill. Sept. 13, 2011) (citing *Project Hope v. M/V IBN SINA,* 250 F.3d 67, 74-75 (2d Cir. 2001)). And, at the pleadings stage, it is immaterial that ConGlobal denies that it moved the container. The Carmack Amendment claim survives against ConGlobal.

### B. Breach of Contract

#### 1. Alternative Pleading

In the amended complaint, Codan also asserts two state law claims against ConGlobal, pleaded solely as *alternatives* to the Carmack Amendment claim. *See* Am. Compl. ¶¶ 42, 50; Pl. Resp. at 9. Codan acknowledges that it cannot recover simultaneously under *both* the Carmack Amendment and Illinois common law. Pl. Resp. at 9-10. With that concession in place, there is generally nothing wrong with

8

pleading in the alternative. *See Pizzo*, 258 F.3d at 634 ("Although not so pleaded, Pizzo's Carmack Amendment claim is best understood as an alternative to her RICO and state law claims … . There is nothing wrong with alternative pleading, of course, or with filing a contingent claim to avoid the running of the statute of limitations." (internal citations omitted)); Fed. R. Civ. P. 8(d)(2). To be sure, if preemption is complete and prevents even the alternative theory, then dismissal at the pleadings stage might be permissible. *See Mitsui Sumitomo Ins. v. Wheels MSM Canada*, 2016 WL 6395428, at *3 (N.D. Ill. Oct. 28, 2016); *Mitsui Sumitomo Ins. Co. of Am. v. Basic Enters., Inc.*, 2014 WL 4407645, at *2-3 (N.D. Ind. Sept. 8, 2014) (holding bailment claim preempted for not alleging a separate and distinct harm). But if preemption is not complete—or, more importantly here, if preemption might be inapplicable in the event that ConGlobal turns out *not* to be a carrier—then both sets of claims should move forward as alternative theories. *See Sompo Japan Ins. Co. of Am. v. B&H Freight, Inc.,* 177 F. Supp. 3d 1084, 1086-87 (N.D. Ill. 2016) (Carmack Amendment does not apply to brokers and therefore does not preempt state law claims against defendant if defendant is a broker). As explained next, complete-preemption concerns are not at issue in this case, so Codan's alternative pleading poses no problem. If discovery or a change in theories ends up provoking a preemption problem, then ConGlobal can raise it again at the summary judgment stage. *See Mitsui*, 2016 WL 6395428, at *4.

## 2. Preemption

Moving on to the preemption issue, ConGlobal argues that Codan's state law claims are preempted by the Carmack Amendment. Def. Br. at 7-8. The purpose of the Carmack Amendment was to create a "nationally uniform rule of carrier liability" for interstate shipments. *North Am. Van Lines, Inc. v. Pinkerton Sec. Systems, Inc.*, 89 F.3d 452, 454 (7th Cir. 1996). So it generally preempts all "state and common law remedies" covering that subject—that is, the liability of carriers. *Id.*; *see also Gordon,* 130 F.3d at 288; *Adams Express Co. v. Croninger*, 226 U.S. 491, 504 (1913); *Hughes v. United Van Lines*, 829 F.2d 1407, 1415 (7th Cir. 1987).[6] Not surprisingly, whether the Carmack Amendment preempts state law claims is a simpler question than the one raised here, because the accompanying state law claims typically target a *carrier*—the same carrier targeted by the Carmack Amendment claim. *See, e.g., Gordon,* 130 F.3d at 289; *Pierre v. United Parcel Serv., Inc.*, 774 F. Supp. 1149, 1150-51 (N.D. Ill. 1991); *Gateway, Inc. v. Burlington Northern and Santa Fe Ry. Co.*, 2002 WL 1822919, at *1-3 (N.D. Ill. Aug. 8, 2002). In those situations, preemption generally applies, with state law claims surviving only when they target "separate and independently actionable harms" that are "distinct from the loss of, or the damage to, the goods." *Gordon,* 130 F.3d at 289.

---

[6]In *Adams*, the Supreme Court held that the Carmack Amendment does occupy the field when it comes to regulating the liability of carriers for shipments. *See Adams,* 226 U.S. at 505-06 ("Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject, and supersede all state regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the state upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the state ceased to exist.").

But the wrinkle here is that Codan's state law claims are only pled in the *alternative*—so if it turns out that ConGlobal is a carrier under the Carmack Amendment, then the common law negligence and breach-of-contract claims will be preempted. After all, the only alleged injury is comprised of the spoilage of the pork, so the damages are confined to the cargo's value. No party disagrees on that point. *See* Pl. Resp. at 10 ("Therefore, should the Court determine that the Carmack Amendment governs ConGlobal's liability here, Plaintiffs' causes of action against ConGlobal for breach of contract and negligence may properly be dismissed.").

Where the parties diverge is the scenario in which ConGlobal is deemed *not* to be a carrier under the Carmack Amendment. In that situation, ConGlobal would face only the state law claims. Yet ConGlobal contends those claims would still be preempted. Def. Br. at 7-8. ConGlobal fails to cite any supporting authority for the proposition that a non-carrier—which is not subject to the Carmack Amendment—can do whatever it wants to a shipment of goods, and yet call upon the preemption of the Carmack Amendment to escape liability altogether. For its part, Codan points to the general authority to sue shipping brokers, who are governed by the Interstate Commerce Act but not subject to the specific strict liability framework saved for carriers and freight forwarders. *See* 49 U.S.C. § 14706 *et seq.*; *see also Custom Cartage, Inc. v. Motorola, Inc.,* 1999 WL 89563, at *2-3 (N.D. Ill. Feb. 16, 1999). In *Custom Cartage,* the plaintiffs similarly pleaded alternative state law claims, which they admitted were only applicable if the defendant was "a broker and not a carrier." *Id.* at *2. Like ConGlobal here, the defendant essentially argued it was

"shielded from all liability," because the Carmack Amendment was the exclusive remedy and it was not a carrier. *Id.* But, as the district court reasoned, the statute's silence on that point does not mean that the Carmack Amendment grants "absolute immunity for breach of contract or tort actions arising out of the interstate shipment of goods." *Id.* at *3. The district court held that the Carmack Amendment did not exempt brokers from "paying for their own negligence, or prevent them from entering into contracts with shippers," so the state court claims continued. *Id.*; *see also Byrton v. Dairy Products, Inc. v. Harborside Refrigererated Services, Inc.,* 991 F. Supp. 977, 984 (N.D. Ill. 1997) (awarding breach of contract damages after determining defendant was not a freight forwarder for Carmack liability). Just so here. If further discovery reveals that ConGlobal is not a carrier subject to the Carmack Amendment, then the Amendment's preemption would not apply to the state law claims. At this stage of the litigation, then, ConGlobal's preemption argument does not require dismissal of the state law claims.

### 3. Breach of Contract

In its next bid for dismissal, ConGlobal argues that Codan fails to state a claim for breach of contract. To state a claim under Illinois law, Codan must allege (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiffs; (3) a breach by the defendant; and (4) resultant damages. *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (citing *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). On its face, the amended complaint clearly covers the necessary ground. Codan alleges that

Mitsui, acting as Tomex's agent, hired ConGlobal and entered into a valid and enforceable contract to provide a shipping container. Am. Compl. ¶¶ 22, 24, 25, 42. The alleged contract required ConGlobal to set the refrigerated temperature to -18° C, which it failed to do when it set the thermostat at +18° C. *Id.* ¶¶ 9, 25, 44. The incorrect temperature caused the pork to thaw and spoil, causing the damages sought in this suit. *Id.* ¶¶ 33-34, 47. Even though Plaintiffs did not specifically plead that Mistui or Tomex performed under the contract (namely, paying consideration for the container), that specific allegation is not needed to avoid dismissal. First, because ConGlobal turned over the shipping container and transferred it as supposedly contracted, it may be reasonably inferred that Mitsui performed its part under the contract. *See Woofbeach, Inc. v. Holland,* 2017 WL 8209095, at *6-7 (N.D. Ill. Dec. 11, 2017). And even without the benefit of that inference, Codan has included "enough facts" that reasonably support its right to relief and put ConGlobal on notice to prepare its defense. *Neumann v. Borg-Warner Morse Tec LLC*, 168 F. Supp. 3d 1116, 1121-22 (N.D. Ill. 2016) (citing *Twombly*, 550 U.S. at 555). So that deficiency does not warrant dismissal, and an amendment to simply state that "Mitsui performed all duties under the contract" would not serve any purpose. So performance, breach, and damages are all sufficiently pled.

The only hitch is that Tomex did not directly contract with ConGlobal. Rather, Tomex alleges that Mitsui, acting as its agent, entered into the container contract. Although the Plaintiffs did plead that Mitsui was acting as Tomex's agent, Am. Compl. ¶ 42, ConGlobal argues that it had no reason to believe that Mitsui was

13

acting as an agent. Def. Br. at 8-9.[7] But it is reasonable to infer that ConGlobal knew that Mitsui—a shipping company—did not own the pork, so Mitsui was acting on behalf of *someone* else, even if ConGlobal did not know it was Tomex specifically. *See* Am. Compl. ¶ 45; *see Lang v. Consumers Ins. Serv., Inc.,* 583 N.E.2d 1147, 1152 (Ill. App. Ct. 1991). Under Illinois law, a contract with a "partially disclosed principal" is one in which "the third party knows that the agent is contracting on behalf of a principal but does not know the identity of the principal." *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.,* 730 N.E.2d 1143, 1146 (Ill. App. Ct. 2000). And that partially disclosed principal can sue to enforce the contract entered into on its behalf. *See Lake Shore Mgmt. Co. v. Blum,* 235 N.E.2d 366, 368 (Ill. App. Ct. 1968) ("A third party who deals with the agent of a partially disclosed principal is liable to the principal unless he is excluded as a party by the form or terms of the agreement."); *BBC Chartering & Logistic GmbH & Co. K.G. v. Rotec Indus., Inc.,* 2010 WL 4719695, at *3 (N.D. Ill. Nov. 15, 2010) (citing *Lake Shore,* 235 N.E.2d at 368); *see also Brunswick Leasing Corp. v. Wisc. Cent., Ltd.,* 136 F.3d 521, 531 (7th Cir. 1998) (applying Illinois law) ("[G]enerally an undisclosed principal may sue to

---

[7]ConGlobal tries to make this argument by relying on apparent agency. In Illinois, apparent agency exists if "(1) the principal consents to or knowingly acquiesces in the agent's conduct, (2) the third party has a reasonable belief that the agent possesses authority to act on the principal's behalf, and (3) the third party relied to his detriment on the agent's apparent authority." *Bethany Pharmacal Co., Inc. v. QVC, Inc.,* 241 F.3d 854, 860 (7th Cir. 2001) (citing *Stathis v. Geldermann, Inc.,* 692 N.E.2d 798, 807 (Ill. App. Ct. 1998)). The point of apparent agency is that it binds the *principal* to a contract, based on an apparent agent's actions. But ConGlobal is not the principal in the alleged contract; rather, it is the contracting party who supposedly dealt with Tomex's agent, Mitsui. It is unnecessary to plead that Mitsui acted with apparent agency—the principal, Tomex, is not trying to argue its way out of its obligations to the contract. Quite the opposite, it is affirming that Mitsui could contract on its behalf to get the product to its destination. ConGlobal's argument on this point gets it backwards.

enforce a contract entered into on its behalf."); RESTATEMENT (SECOND) OF AGENCY § 292 (Am. Law. Inst. 1958). Based on the authority of a partially disclosed principal to enforce its agent-formed contracts, the breach of contract claim survives.

### 4. Negligence

Finally, ConGlobal argues that at least the negligence claim should be dismissed because (1) ConGlobal owed no duty to Tomex; and (2) even if it owed a duty, the claim is barred because it only seeks economic loss. Def. Br. at 1, 10. These arguments are rejected.

To plead a negligence claim, a plaintiff must "plead the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages." *Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995). ConGlobal summarily states in its introductory synopsis that Codan did not sufficiently allege ConGlobal's necessary duty of care. *See* Def. Br. at 1; R. 54, Def. Reply at 2. But ConGlobal never actually addresses this argument in the remainder of the brief—instead it advances only the economic loss argument (which in Illinois is known as the *Moorman* doctrine). This failure results in forfeiture of the point. Even if ConGlobal had not forfeited it, the argument would fail. Codan did plead that ConGlobal owed it a duty of care, because it was contractually obligated to provide a refrigerated container set at -18° C for the product. Am. Compl. ¶¶ 49-50.[8] ConGlobal allegedly breached that duty by setting the

---

[8]Under Illinois law, a duty of care can arise from a contract. *Kotarba v. Jamrozik*, 669 N.E.2d 1185, 1188 (Ill. App. Ct. 1996) ("Where a defendant is charged with negligence

15

temperature too high, which caused the frozen pork to thaw and spoil. *Id.* ¶¶ 51-52. Those facts are sufficient to allege that ConGlobal owed a duty to Tomex and breached it.

Turning to the economic loss argument, the allegations here make it clear that dismissal is not warranted on that basis. In *Moorman Manufacturing*, the Illinois Supreme Court held that a party "cannot recover for solely economic loss under the tort theories of strict liability, negligence and innocent misrepresentation." *Moorman Mfg. Co. v. National Tank Co.*, 435 N.E.2d 443, 453 (Ill. 1982). Economic damages are those for "inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property." *1324 W. Pratt Condominium Ass'n v. Platt Constr. Grp. Inc.,* 936 N.E.2d 1093, 1099 (Ill. App. Ct. 2010) (quoting *Moorman*, 435 N.E.2d at 449). There are exceptions to the *Moorman* doctrine, but none apply here.[9] That is unimportant, however, because *Moorman* itself does not

---

because of his failure to perform an act allegedly required by contract, the question of whether the defendant had a duty to perform the act is determined by the terms of the contract itself."). And it is irrelevant that Tomex may be a third party to the contract, because a contracting party owes a duty of care to third parties that may foreseeably be injured by the contracting party's breach. *See Klecan v. Countrywide Home Loans, Inc.,* 951 N.E.2d 1212, 1216 (Ill. App. Ct. 2011). As the owner of the refrigerated pork, Tomex was obviously a foreseeable plaintiff. By agreeing to provide a container set to a specific temperature, ConGlobal owed Tomex a duty of care. That may change if discovery reveals there was not an actual contract between Mitsui and ConGlobal, *see Kotarba,* 669 N.E.2d at 1188, but it is a question more appropriate for summary judgment.

[9]There are three exceptions to the bar against economic loss: "(1) where the plaintiff sustained damage, *i.e.*, personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false misrepresentation, *i.e.*, fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions." *In re Chicago Flood Litig.*, 680 N.E.2d 265, 275 (1997) (cleaned up).

come into play—Codan and Tomex are not "products liability plaintiff[s]" trying to "recover solely economic loss." *In re Chi. Flood*, 680 N.E.2d at 274. Even though the Illinois Supreme Court has extended the rule to negligently performed services, *Anderson Electric, Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (1986), the underlying facts of the case are not based on Codan's defeated expectations of a commercial bargain: the Plaintiffs are not suing over their dissatisfaction with "the quality of the product" that ConGlobal provided. *Id.* at 248 (citing *E. River S.S. Corp. v. Delaval Turbine, Inc.*, 752 F.2d 903, 909-10 (3d Cir. 1985)). This is not an instance of Codan suing ConGlobal for lost profits because the provided refrigerator malfunctioned (that form of damages might very well be barred by *Moorman*). Instead, Codan alleges that ConGlobal provided a container, but negligently set the thermostat too high, causing separate property damage to nearly $70,000 in pork. That is a claim for "damage to other property" that is separate from ConGlobal's contracted provision of a refrigerator. *See Moorman*, 435 N.E.2d at 449 (citation omitted). Codan only seeks reimbursement for the *property* damage caused by ConGlobal's alleged negligence, not for economic damages like lost profits. Pl. Resp. at 16 n.4. The form of damages sought by Codan does not fall into the purview of the bar against economic loss.

## IV. Conclusion

For the reasons discussed, ConGlobal's motion to dismiss is denied. The primary claim, under the Carmack Amendment, survives because ConGlobal is

17

sufficiently alleged to be a carrier. The state law claims survive as claims asserted in the alternative.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 4, 2018